**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| MIDWEST SWIM & ACTIVE, LLC, )<br>　　Plaintiff/Counter-defendant, )<br>　　　　　　　　　　　　　　　　　　)<br>vs.　　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>J. KEVIN MCFALL, )<br>　　Defendant/Counter-claimant, )<br>　　　　　　　　　　　　　　　　　　)<br>vs.　　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>JONATHAN WIESNER, )<br>　　Counter-defendant. ) | Case No. 05-0312-CV-W-FJG |

## ORDER

Pending before the Court are (1) plaintiff Midwest Swim & Active, LLC and counterclaim defendant Jonathan Wiesner's Motion for Summary Judgment (Doc. No. 82); and (2) defendant J. Kevin McFall's Motion for Summary Judgment (Doc. No. 94). Each motion will be considered below.

**I.    Background.**

Plaintiff Midwest Swim & Active, LLC ("Midwest Swim") filed its petition against Defendant McFall on February 17, 2005, in the Circuit Court of Jackson County, Missouri, seeking to recover on certain promissory notes. Defendant removed plaintiff's suit to this Court on April 7, 2005. See Doc. No. 1. Defendant filed his answer and counterclaim against Midwest Swim, as well as a claim against Midwest Swim's president, Jonathan Wiesner, on May 13, 2005. Doc. No. 7.

Plaintiff's claims against McFall pertain to three individual promissory notes (hereafter, the "Notes"), which were executed in 2002 and 2003. Defendant McFall signed these Notes on behalf of Imagine Capital Corporation ("ICC"). At the time defendant McFall signed the Notes, ICC's corporate charter had been forfeited. However, ICC's corporate charter was reinstated in 2005.

On August 11, 2005, after ICC's corporate charter had been reinstated, plaintiff filed its First Amended Complaint, adding ICC as a co-defendant. See Doc. No. 26. On August 29, 2005, defendant ICC filed a motion to dismiss due to lack of personal jurisdiction. Doc. No. 30. On October 21, 2005, this Court granted defendant ICC's motion to dismiss. Doc. No. 51. Therefore, McFall is the only remaining defendant in the present matter.

Plaintiff Midwest Swim and defendant McFall have filed cross motions for summary judgment as to plaintiff's claims on the promissory notes. Midwest Swim and counter-defendant Jonathan Wiesner have also moved for summary judgment as to McFall's counterclaims.

**II.  Facts.**

Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Kansas City, Missouri. Defendant is an individual residing in the State of Connecticut. Defendant was the president of Imagine Capital Corp. ("ICC"), a corporation organized under Texas law, from 1988 through 2005.

ICC was established for purposes of providing consulting and licensing services to companies in the clothing and swimwear industries. During its 17 years in existence, ICC has had numerous employees, has filed corporate tax returns, has paid all state and federal taxes, including franchise taxes, and has held annual meetings. ICC has Bylaws and Articles of Incorporation and maintains minutes of its corporate activities. Since ICC's inception in 1988, McFall has filed his own individual tax returns, which are separate and distinct from the tax returns that have been filed on behalf of ICC. Since its formation in 1988, ICC has entered into consulting contracts with other companies. ICC has never been authorized to do business in the state of New York.

ICC forfeited its charter or certificate of authority in Texas on February 15, 1994, when the Texas Secretary of State issued a Determination of Forfeiture Pursuant to Section

-2-

Case 4:05-cv-00312-FJG   Document 138   Filed 09/28/06   Page 2 of 15

171.309, Texas Tax Code Annotated. After the corporate charter was forfeited in 1994, no application was made to set aside the forfeiture until May 2005. ICC's charter was reinstated by the Texas Secretary of State on May 12, 2005. ICC currently is in good standing under Texas law.

On or about January 31, 2002 in New York City, defendant McFall signed a promissory note on behalf of ICC, promising to pay to the order of plaintiff the principal sum of $132,000.00, with interest thereon at the rate of 2% per annum. No payments have been made on this promissory note, and plaintiff has declared the note to be immediately due and payable.

On or about September 2, 2003 in New York City, defendant McFall signed a promissory note on behalf of ICC, promising to pay to the order of plaintiff the principal sum of $396,000.00, with interest thereon at the rate of 4.25% per annum. No payments have been made on this promissory note, and plaintiff has declared the note to be immediately due and payable.

On or about January 31, 2002 in New York City, defendant signed a promissory note on behalf of ICC, promising to pay to the order of Midwest Swimwear Group, LLC the principal sum of $264,000.00, with interest thereon at the rate of 2% per annum.[1] No payments have been made on this promissory note. Plaintiff has declared the full amount of the note to be immediately due and payable.

In June 2000, Jonathan Wiesner and J. Kevin McFall negotiated an agreement to form Midwest Swimwear Group, LLC. At the conclusion of their negotiations, Jonathan Wiesner, as President of Midwest Apparel Group, and J. Kevin McFall executed a written Operating Agreement. Defendant testified he reviewed the Operating Agreement before

---

[1]Plaintiff states that this promissory note has been assigned to Midwest Swim & Active, LLC; however, plaintiff provides no documents supporting this assignment. The only support for this assertion is the affidavit of Jonathan Wiesner, which states that this assignment has been made.

signing it. Defendant never made any capital contribution to Midwest Swimwear Group, LLC. The Midwest Swimwear Group, LLC Operating Agreement provides that distributions be made to defendant when certain conditions are met. In particular, the agreement provides that:

> no distribution shall be declared and paid unless, after the distribution is made, the total assets of the Company exceed the sum of its total liabilities to which such assets are subject, the Company is able to pay its debts as they become due in the usual course of business and the Company satisfies such other requirements as may apply under the [Delaware Limited Liability Company] Act.

See Midwest Swimwear Group, LLC Operating Agreement (Exhibit 1 to Deposition of J. Kevin McFall), § 10.4.

Certain distributions were paid by Midwest Swimwear Group, LLC to ICC on a monthly basis. The $132,000 note signed on January 31, 2002, represents funds paid to ICC over the course of 2001. The parties dispute whether the $396,000 reflected by the two notes signed on January 31, 2002, was carried on the books of ICC as a loan advance or whether that amount was treated as income to ICC in the form of "non-employee compensation."[2] The $396,000 note, signed on September 2, 2003, represented the sum of monthly checks sent by plaintiff during the course of 2002.[3]

Plaintiff represents that in 2003, the Limited Liability Company Certificate of Midwest

---

[2]Compare Deposition of J. Kevin McFall at 74-75 (discussing these amounts being a loan advance) with 1099-misc issued by Midwest to Imagine Capital Corporation for the calendar year 2001, attached as Exhibit E to Doc. No. 91, and deposition of Pat Rivera, accountant for Imagine Capital Corporation, p. 42, line 22 to p. 44 line 8, attached as Exhibit G to Doc. No. 91 (discussing treatment of the $396,000 as income rather than loan proceeds). Plaintiff further argues that the 1099-misc issued to ICC was an error by plaintiff's accounting service. See deposition of Aggie Cooper at pp. 16-28, attached to Doc. No. 101 as Ex. 15.

[3]Although defendant attempts to controvert this statement, an examination of defendant's deposition at p. 71 confirms that his testimony is that the $396,000 note represents the sum of the monthly checks sent in 2002.

-4-

Swimwear Group, LLC was cancelled, and its assets, including promissory notes, were assigned to Midwest Swim & Active, LLC.[4] In September 2001, Jonathan Wiesner, as President of Midwest Apparel Group, Inc., and J. Kevin McFall executed the Midwest Swim & Active, LLC Operating Agreement. Defendant does not recall the exact location where he signed the agreement. McFall never made a capital contribution to Midwest Swim & Active, LLC. McFall became the Executive Vice President of Midwest Swim & Active, LLC. Aggie Cooper was the corporate Secretary of Midwest Swim & Active, LLC, and at other times during her tenure with Midwest served as vice-president and president of the company.

The Midwest Swim & Active, LLC Operating Agreement provides that distributions be made to defendant when certain conditions are met. In particular, the agreement provides that:

> no distribution shall be declared and paid unless, after the distribution is made, the total assets of the Company exceed the sum of its total liabilities to which such assets are subject, the Company is able to pay its debts as they become due in the usual course of business and the Company satisfies such other requirements as may apply under the [Delaware Limited Liability Company] Act.

See Midwest Swim & Active, LLC Operating Agreement (Exhibit 3 to Deposition of J. Kevin McFall), § 10.4.

McFall does not know whether either Midwest Swimwear Group, LLC or Midwest Swim & Active, LLC ever turned a profit.[5] Although McFall has no basis to believe that his

---

[4] Notably, however, plaintiff produces no documents reflecting this alleged assignment, and instead relies on the bare affidavit of Jonathan Wiesner in support of this proposition.

[5] Plaintiff asserts that the total assets of Midwest Swimwear Group, LLC and Midwest Swim & Active, LLC have never exceeded the company's total liabilities; however, in support of this proposition, plaintiff attaches no documentation, such as financial statements, balance sheets, or tax returns. Instead, plaintiff relies on the affidavit of Jonathan Wiesner, who simply states that Midwest Swimwear Group, LLC's and plaintiff's assets have never exceeded their liabilities.

membership interest in Midwest Swimwear Group, LLC holds any value currently, he indicates that he has reason to believe it had value in the past and that he was denied the value he was owed under the terms of the Operating Agreement he executed with Midwest Swimwear Group, LLC. In particular, McFall asserts that he may have been denied allocation of tax deductions for business losses. McFall has no view as to what the value of his membership interest in Midwest Swim & Active is or was.

McFall left Midwest Swim & Active in November 2003. It was his decision to leave the company. He decided to leave because the Company was having financial difficulties and he no longer wanted to be associated with it. McFall believes that Midwest Swim & Active wanted him to remain with the Company.

After he had been with Midwest for about five months, Aggie Cooper asked McFall to sign a personal guaranty of the Company's line of credit and said that it was needed for the company to obtain its operating line of credit. Defendant testified that Aggie Cooper told him that the guaranty was "just a formality of doing business" and that McFall "would be third in line if anything were to go wrong with the note." In response to the question, "Was there anything inaccurate in what she [Aggie Cooper] told you?" defendant responded, "I don't know." Deposition of J. Kevin McFall at p. 82, lines 9-11. Defendant further testified that he later learned that Ms. Cooper had misrepresented the legal ramifications of the guaranty and that McFall could in fact be "on the hook" for the total amount of the loan and that he "was not third in line, but was equally liable for whatever monies were owed." Id., p. 82, line 1 to p. 83, line 16. Prior to signing the guaranty, McFall was given a brief opportunity to review it, and he did review it. Id., p. 82. Defendant has never been called upon to make any payments toward the Commerce Bank loan.

Plaintiff asserts that the company's line of credit later switched from Commerce Bank to UMB Bank. Defendant signed a personal guaranty to UMB Bank. Defendant was subsequently released from the guaranty to UMB Bank. Defendant has never been called

upon to make any payments on the UMB guaranty.

## III. Summary Judgment Standard.

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

**IV. Discussion.**

    A.    Defendant's Motion for Summary Judgment (Doc. No. 94)

Defendant McFall indicates that he should not be found liable as to the three promissory notes because (1) he signed the notes in his representative capacity as President of ICC, he cannot be found personally liable for the notes; (2) ICC is not the "alter ego" of J. Kevin McFall, and so defendant cannot be found liable under an "alter ego" theory; (3) the forfeiture of ICC's corporate charter does not create liability as to defendant McFall; and (4) certain of the promissory notes lack consideration. Plaintiff responds only to defendant's arguments (3) and (4), apparently conceding defendant's arguments that corporate representatives generally cannot be found personally liable for obligations entered into on behalf of the corporation and that ICC is not the "alter ego" of McFall. Further, the Court finds it unnecessary to reach the issue of whether the promissory notes lack consideration. Defendant's remaining argument, regarding forfeiture of the corporate charter, is considered below.

Initially, the Court notes that Missouri's choice of law rules indicate that the laws of a corporation's domicile govern on issues relating to the fact and duration of the existence of such corporations. <u>Riley v. Best Truck Lines, Inc.</u>, 510 S.W.2d 229, 233 (Mo. Ct. App. 1974). As ICC is a Texas corporation, its authority to conduct business is an issue governed by Texas law.[6]

In the present matter, it is undisputed that ICC's corporate charter was forfeited by the Texas Secretary of State on February 15, 1994, pursuant to Section 171.309 of the

---

[6]In its initial motion for summary judgment (Doc. No. 82) and suggestions in support (Doc. No. 84), plaintiff argued that Texas law would apply in this situation. However, in later briefing, after being presented with strong defense arguments under Texas law, plaintiff argues that New York law should apply as to "the liability of an officer wrongfully incurring debt in New York." As discussed below, the Court declines to apply New York law in this situation.

-8-

Texas Tax Code Annotated.[7]  No application was made to set aside the forfeiture until May 2005; thus, all three of the promissory notes at issue in this matter were executed during the period of the forfeiture of ICC's charter.

Plaintiff argues in its motion for summary judgment (Doc. No. 82), that officers of a corporation who purport to incur debt during the forfeiture period are personally liable for such debts, even if the corporation's charter has been reinstated.  See Tex. Tax Code Ann. § 171.255(d).  However, as noted by defendant in his motion for summary judgment (Doc. No. 94), Section 171.255 applies to debt that is "created or incurred in this state."  See § 171.255(a).  Defendant notes, then, that by the statute's own terms, the debt at issue must have been "created or incurred" in the State of Texas.  As the promissory notes at issue in this case were signed in New York, and "a contract is made where acceptance occurs," (see October 21, 2005 Order Dismissing Imagine Capital Corporation, Doc. No. 51; Durant Chevrolet Company v. Industrial Towel & Uniform Co., 624 S.W.2d 628, 631 (Tex. Ct. App. 1981)), defendant argues that the debts at issue in this case were not "created or incurred" in the state of Texas.  Defendant states that, as this statute (which provides an exception to the normal rule that a corporation's officers will not be liable for its debts) does not apply in this situation, defendant cannot be found personally liable for the promissory notes.

In response, plaintiff argues that defendant has distorted the plain meaning of Tex. Tax Code Ann. § 171.255.  Plaintiff states that under Texas law it is important to give every word of the statute due consideration.  See Perkins v. State, 367 S.W.2d 140 (Tex. 1963).  Plaintiff argues that defendant ignores the disjunctive use of the words "created or incurred," stating that defendant "would apparently construe these terms as synonymous, thus robbing each of independent meaning."  Plaintiff argues that, even assuming the debt was created in New York, the debt was not necessarily "incurred" in New York.  Plaintiff

---

[7]Chapter 171 of the Texas Tax Code governs the collection of franchise taxes in Texas.  Apparently defendant's charter was forfeited for failure to pay franchise taxes.

-9-

looks to Webster's College Dictionary, which defines "incur" as "to become liable for; to incur debts." Plaintiff then states that the "debt itself was incurred in the state of Texas – ICC's place of incorporation," arguing that as ICC has never been authorized to do business in New York, the debt must have been incurred in the state of Texas, ICC's home state.[8]

Defendant replies, noting that Webster's Dictionary is not the best source as to the meaning of the words "created or incurred"; instead, Texas courts have already determined the meaning of those words as used in the statute. As noted by the Supreme Court of Texas:

> The words "created" and "incurred," as used in the statute, have a clear and well defined meaning. The word "create" means "To bring into existence something which did not exist." 10 Words and Phrases, Perm. Ed., p. 331; Roth v. State, 158 Ind. 242, 63 N.E. 460, 469. The word "incur" is defined in Ashe v. Youngst, 68 Tex. 123, 125, 3 S.W. 454, 455 as "Brought on," "occasioned," or "caused."

Schwab v. Schlumberger Well Surveying Corp., 145 Tex. 379, 382, 198 S.W.2d 79, 81 (Tex. 1946); River Oaks Shopping Center v. Pagan, 712 S.W.2d 190, 191-92 (Tex. Ct. App. 1986) (applying the court's interpretation of terms in Schwab to Tex. Tax Code § 171.255 in its current form). Thus, pursuant to the Texas courts' interpretation, these terms should be read as synonymous. Further, defendant argues that if plaintiff's interpretation of "incurred" was adopted, there would be no limit as to the debts covered by this statute, as all debt of a Texas corporation would be "incurred" in Texas. This would make the language "in this state" superfluous, a result that defendant states Texas surely did not intend.

The Court agrees with defendant's statutory construction arguments, and finds that defendant is not liable under Texas Tax Code Annotated § 171.255 for the promissory

---

[8]The Court notes, as does defendant in his reply, the absence of any authority in plaintiff's brief for the proposition that a corporation needs state-sanctioned authority to execute a promissory note within that state's borders.

-10-

notes he signed on behalf of ICC.  The Court further notes Texas courts have repeatedly held that because Section 171.255 is penal and remedial in nature, it must be strictly construed, and that strict construction requires construing the statute in a way that favors officers and directors. See In re Cooley, 166 B.R. 85, 87 (Bankr. S.D. 1993); Williams v. Adams, 74 S.W.3d 437, 440 (Tex. Ct. App. 2002); Davis v. State, 846 S.W.2d 564, 570 (Tex. Ct. App. 1993); Rogers v. Adler, 696 S.W.2d 674, 677 (Tex. Ct. App. 1985).[9]

Plaintiff also argues, in the alternative, that if the Court accepts defendant's arguments regarding Texas law, defendant should be held liable under New York law. Plaintiff states that "Section 171.255 necessarily declares that, absent the existence of debt created or incurred in Texas, courts should look to the law of the place where the debt was created or incurred to determine the liability of the corporation's officers or directors." Plaintiff provides no legal support for this proposition, and Section 171.255 certainly does not "necessarily declare" anything as to this issue.  Instead, as pointed out by defendant, Missouri courts have consistently held that the law of a corporation's state of incorporation should govern claims brought against corporate officers, directors and/or shareholders. See Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc., 690 S.W.2d 437, 444 (Mo. App. 1985); Johansen v. St. Louis Union Trust Co., 131 S.W.2d 599, 603 (Mo. banc 1939); In Re Moss, 258 B.R. 405, 424 (Bkrtcy. W.D. Mo. 2001).  Further, under Section 309 of the Restatement (Second) of Conflicts of Law, there is a presumption that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to…its creditors…except where, with respect to the particular issue, some other state has a more significant relationship…to the parties and the transaction…." This Court agrees with defendant that New York does not have a "more significant relationship" than

---

[9]Although plaintiff states in a footnote to its response (Doc. No. 104) that Section 171.255 would be "unconstitutional as a state-created protectionist statute in violation of the dormant Commerce Clause" if interpreted in this fashion, plaintiff provides no analysis as to why this is so.  This Court is unwilling to deny defendant's motion for summary judgment on this basis.

-11-

Texas as to the "parties or transactions" or as to the "particular issue" as to the effect of the forfeiture and subsequent reinstatement of ICC's corporate charter on actions taken by ICC's president during the forfeiture period. Therefore, the Court declines plaintiff's invitation to examine defendant's actions using New York law.[10]

Accordingly, for the above-stated reasons, defendant's motion for summary judgment (Doc. No. 94) is **GRANTED**, and the claims in plaintiff's complaint as to defendant McFall are **DISMISSED.**

      B.      Plaintiff's Motion for Summary Judgment (Doc. No. 82)

           1.      <u>Plaintiff's Claims on the Promissory Notes</u>

For the same reasons as discussed above, plaintiff's motion for summary judgment (Doc. No. 82) as to this issue is **DENIED.**

           2.      <u>Defendant's Counterclaim for Breach of Contract against Midwest Swim & Active, LLC</u>

Plaintiff asserts that it is undisputed that the financial benchmarks for making distributions were never met, and therefore summary judgment should be granted in its favor. However, as noted by defendant, even if financial benchmarks were never met, questions remain as to whether defendant was entitled to tax loss benefits owed under the Operating Agreement. Additionally, defendant raises questions about plaintiff's accounting practices and whether improper transfers to other related companies were made by plaintiff. As the only evidence before the Court that the financial benchmarks were never met is Mr. Wiesner's self-serving affidavit, the Court finds that questions remain as to whether the financial benchmarks for making distributions were met. Therefore, plaintiff's motion for summary judgment (Doc. No. 82) is **DENIED** as to this issue.

---

[10]Additionally, as pointed out in defendant's reply, it is apparent that New York law is not settled as to this issue, and resolution of these issues using New York law would not necessarily compel a victory for plaintiff. See cases discussed in Doc. No. 106, pp. 7-10.

### 3. Defendant's Counterclaim for Misrepresentation against Midwest Swim & Active, LLC and Jonathan Wiesner

Defendant claims he was fraudulently induced to enter into the Operating Agreement and two loan guaranties based on misrepresentations made regarding the rights and obligations conferred by the documents. Plaintiff and counterclaim defendant Wiesner claim, however, that as it is undisputed that defendant had a full opportunity to review the documents before signing, defendant's claims for misrepresentation must fail.

In his counterclaim (Doc. No. 20), defendant asserts that, as to the Operating Agreement, he was told that he would be entitled to receive certain payments from plaintiff. Doc. No. 20, ¶¶ 35-37. Defendant further asserts that he was promised that he would never be asked to assume personal liability for company debts, and that this promise was memorialized in the contract language of Section 8.1 of the Operating Agreement. Doc. No. 20, ¶¶ 38-39. Defendant additionally asserts that he was told that executing the guaranties of bank loans financing company operations was a formality and that he would not be required to honor the guaranties. Doc. No. 20, ¶¶ 42, 45.

Plaintiff and Wiesner note that a party who signs a contract is presumed to know its contents and has no right to rely on the representations of the other party as to its legal effect. Stein v. Stein Egg & Poultry Co., 606 S.W.2d 203, 205 (Mo. Ct. App. 1980). As long as the party hearing the statements is competent and has a reasonable opportunity to know about the contract by reading it, no claim will lie for fraud in the procurement of a contract. State ex rel. PaineWebber, Inc. v. Voorhees, 891 S.W.2d 126, 130 (Mo. 1995)(en banc). Plaintiff and Wiesner note that the rights and obligations of the parties are spelled out in the Operating Agreement and in the guaranties, and that defendant was given the opportunity to review the documents before signing them.

Additionally, a person who fails to avail himself of means of knowledge within his reach cannot complain that he was defrauded. Modern Enters., Inc. v. Allen, 802 F.2d 312, 314 (8th Cir. 1986). Further, under Missouri law, a fraud claimant must show that the

allegedly undisclosed information was beyond his or her reasonable reach and not discoverable in the exercise of reasonable diligence. McClain v. Papka, 108 S.W.3d 48, 52 (Mo. Ct. App. 2003). Plaintiff and Wiesner state that defendant cannot demonstrate that he was defrauded, as the documents defendant signed contained the allegedly undisclosed information, which defendant could have discovered upon reading the documents.

Defendant argues that, while it is generally true that one is presumed to know the contents of a document that one has signed, under Missouri law a party is not permitted to fraudulently induce another to sign a contract when those parties are in a "relationship of trust or confidence." See Pinken v. Frank, 704 F.2d 1019, 1025 (8th Cir. 1983). Defendant argues that a "relationship of trust or confidence" existed between McFall and Wiesner, as McFall had known Weisner for 20 years and Midwest Apparel Group (Midwest's parent company) for approximately 30 years. Defendant argues that as a result of these long relationships, Wiesner, on behalf of Midwest Apparel Group, approached defendant about forming a business. Defendant states, "Based on the long-term relationship of trust and confidence that had been forged between Wiesner and McFall, McFall relied on the representations Wiesner made with respect to his entering into both the Operating Agreement and eventually the guaranties that were signed with UMB and Commerce Bank." See Doc. No. 91. Defendant states that if the Court accepts as true that a relationship of trust was forged between Wiesner and McFall, then an issue of fact exists precluding summary judgment.

Plaintiff and Wiesner reply, and this Court agrees, that simply because defendant knew Mr. Wiesner for many years does not mean that defendant had no obligation to read the documents he signed. In a case where the parties were family members, a Missouri court found no relationship of trust or confidence is automatically established. See Stein v. Stein Egg & Poultry Co., Inc., 606 S.W.2d 203 (Mo. Ct. App. 1980) (finding no fraudulent misrepresentation where defendants, brothers and a nephew of plaintiff, allegedly induced

plaintiff to sign a non-compete agreement by telling plaintiff that if he signed it, defendants would not enforce it). Similar to Stein, the evidence in the present matter shows that defendant (1) had the opportunity to review the documents at issue; and (2) was an experienced and sophisticated business person, and was the president of his company. Additionally, the transactions at issue (the entering of an operating agreement and signing the guaranties) are adversarial in nature. See Stein, 606 S.W.2d at 206.

The Court finds that defendant has not provided evidence adequate to raise a question of fact or even a reasonable inference as to whether a relationship of trust existed between himself and Mr. Wiesner. Therefore, plaintiff and Wiesner's motion for summary judgment (Doc. No. 82) will be **GRANTED** as to defendant's counterclaim for misrepresentation.

**V. Conclusion.**

Accordingly, for the above-stated reasons:

(1) Plaintiff Midwest Swim & Active, LLC and counterclaim defendant Jonathan Wiesner's Motion for Summary Judgment (Doc. No. 82) is **GRANTED IN PART** as it relates to defendant's counterclaim for misrepresentation, and **DENIED IN PART** as it relates to plaintiff's claims under the promissory notes and defendant's counterclaim for breach of contract; and

(2) defendant J. Kevin McFall's Motion for Summary Judgment (Doc. No. 94) is **GRANTED.**

**IT IS SO ORDERED.**

        /s/Fernando J. Gaitan, Jr.
        Fernando J. Gaitan, Jr.
        United States District Judge

Dated: September 28, 2006
Kansas City, Missouri